## William H. Everson et al., Doing Business as the Charlotte Furnace Company, Plffs. in Err., *v.* Isaac Rollinson.

A master is bound to furnish his servants proper tools, machinery, structures, etc.; and if he does not, he is liable in damages for injuries resulting to the servants from his negligence.

Where the fall of a bridge on which a servant is employed to dump coal cars is caused by decay of the timbers, it is, in an action by the servant against the master to recover damages for injuries sustained, for the jury to determine whether the bridge was properly built, whether the defendant employed competent men to inspect it, and whether the defendant had no notice of its dangerous condition; and if the jury do not so find, the plaintiff is entitled to recover.

Where there is evidence of permanent injury, mortality tables are admissible as a basis for the calculation of the plaintiff's expectation of life, and to assist the jury in fixing the damages.

(Argued February 1, 1887. Decided February 14, 1887.)

NOTE.—For the duty to furnish safe appliances, see note to Drew v. Gaylord Coal Co. 2 Sad. Rep. 340.

Mortality tables are admissible where injuries are permanent (McCue v. Knoxville, 146 Pa. 580, 23 Atl. 439; Kraut v. Frankford & S. P. City Pass. R. Co. 160 Pa. 327, 28 Atl. 783); but not annuity tables (Kerrigan v. Pennsylvania R. Co. 194 Pa. 98, 44 Atl. 1069); nor life insurance rate tables, it not appearing upon what they are based (McKenna v. Citizens' Natural Gas Co. 198 Pa. 31, 47 Atl. 990). But mortality tables are based upon individuals in average condition, and the health and habits of the plaintiff must

January Term, 1887, No. 134, E. D., before MERCUR, Ch. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ. Error to the Common Pleas of Fayette County to review a judgment on a verdict for the plaintiff in an action of trespass on the case for negligence. Affirmed.

The facts, as they appeared at the trial before INGHRAM, P. J., are stated in his charge to the jury, which was as follows:

The plaintiff in this case, Isaac Rollinson, seeks to recover from the defendants, W. H. Everson, Edwin Miles and D. S. McCrum, who are doing business as the Charlotte Furnace Company, damages for injuries which the plaintiff alleges were occasioned or caused by the negligence of the defendant company.

It is the duty, and incumbent upon the plaintiff in an action of this kind, to prove that the defendant was guilty of negligence, and that in consequence of such negligence alone he received the injuries complained of.

It appears from the evidence in the case, which is not contradicted, that the defendant company owns or manages a furnace, either in this or the edge of Westmoreland county; that for the purpose of running the furnace it manufactures coke on the Fayette county side of Jacob's creek; that it runs the coke down an incline to Jacob's creek which it crosses with a bridge; that the coke is then dumped from the cars into the furnace or some place there to receive it on the Westmoreland county side. It further appears from the evidence in the case that in the month of July, 1881, the defendant company employed the plaintiff, Isaac Rollinson, at its works, to dump the coke from the cars as they would come down from the coke works, or down the incline, into the furnace across the creek from the coke works. It also appears from the evidence that the plaintiff was employed by the company and was at work for it on the 11th and 12th of July, I believe; and that on the morning of the 12th, he and a Mr. Woods, who was also in the employ of the company, were on the bridge receiving the cars as they came down the incline, and dumping the coke from them, and that while

be taken into consideration in connection with them.  Kerrigan v. Pennsylvnia R. Co. 194 Pa. 98, 44 Atl. 1069; Rummele v. Allegheny Heating Co. 2 Monaghan (Pa.) 98, 16 Atl. 78; Bunting v. Hogsett, 139 Pa. 363, 12 L. R. A. 268, 23 Am. St. Rep. 192, 21 Atl. 31, 33, 34.  And the court should instruct the jury to take such facts into consideration.  Campbell v. York, 172 Pa. 205, 33 Atl. 879.

so in the employ of the company and in the discharge of his duty, the bridge fell into the creek below, I believe a distance of between 30 and 40 feet, and that the plaintiff was very badly injured.

It is claimed by the plaintiff, and I believe not disputed by any evidence in the case, that he was struck upon the head by some of the timbers of the bridge and injured in the fall; that his skull was injured to a certain extent, that one of his eyes was injured, some of his teeth knocked out, his face scratched, his back wrenched, and that his hip was either dislocated or broken; and it is claimed by the plaintiff, that on account of these injuries he was confined to his bed for some time, that he was unconscious for about six days, and that he is permanently injured.

It is further claimed by the plaintiff that the testimony of Dr. Rogers goes to show that his hip was not dislocated, but that there was a fracture of the hip; that the fracture could not be reduced at the time, and that by reason of that fracture the one leg is shorter than the other by three quarters of an inch, and that the plaintiff is permanently disabled. About these matters there seems to be very little dispute.

But it is claimed by the plaintiff that the testimony shows that this accident was caused by the negligence of the defendant company in not keeping the bridge, which fell, in proper repair. It is claimed by the plaintiff that at the time the bridge did fall the timbers were rotten, decayed to such an extent as to cause them to fall, or as to render them unsafe for the use to which they were put by the company; and it is claimed by the plaintiff that the evidence showed that the company was aware of this fact; that it had been informed by other employees, prior to this time, of the defect in the timbers of the bridge, and that it had neglected to repair it; and that in consequence of this defect and the neglect of the company to repair it, the accident happened and the injuries were caused for which he is seeking in this action to recover damages.

[It is claimed by the plaintiff that the testimony of Mr. Finley, I believe, goes to show that immediately after the accident he heard the noise, ran down to the creek and assisted in taking the plaintiff out from under the timbers, or out of the creek, and that he examined the timbers there and found some of them decayed on the inside, and that some of them were rotten, even

to the outside; and it is claimed on the part of the plaintiff that this fact was known to the defendant company, and that it was the defect of the timbers that caused the accident. It is further claimed on the part of the plaintiff that the testimony of other witnesses who were present soon after the accident happened, and who examined the timbers and who saw them there, is to the same effect—that they saw that some of the timbers were decayed—some of them on the inside and others on the outside.]

It is also claimed by the plaintiff that the testimony of Mr. Lynch goes to show that a short time before this accident happened he was in the employ of the company, and that he went upon the bridge and trestle with the blacksmith, I believe, a Mr. Hawthorne, for the purpose of examining the bridge and the timbers of the trestle, to ascertain whether they needed any repairs or not or whether they were in a safe condition; and it is claimed that the testimony goes to show that when they bored into the timbers for the purpose of inserting a bolt or rod of some kind, they discovered that the timbers were rotten, and that Hawthorne requested Lynch to go to Mr. Miles, who was either the superintendent or a member of the firm, and notify Mr. Miles of the discovery, and he claims that he did so; that he told him about the defect in the timber, or rottenness, and that Mr. Miles asked him if they couldn't repair it in such a way as to make it last a short time, until they could build a new bridge; and it was claimed that this testimony goes to show that the bridge was not only defective, but that the defendant company had full knowledge of the fact, through the parties employed by it to inspect it and keep it in repair; and it is claimed on the part of the plaintiff that for the neglect of the company to repair the bridge at the time it should have done so, when it received the knowledge that it was defective, that the accident happened and that it is now responsible for the accident and for any damages resulting therefrom; that he was injured very badly, as the testimony shows, and, as he claimed, by the neglect of the company to make the necessary repairs upon the bridge at the time it should have done so, and that therefore he is entitled to recover a verdict at your hands, for such damages as you may find from the evidence he has suffered from the neglect of the defendant company to repair the bridge.

On the part of the defendant company, as we have stated, it is not denied that Mr. Rollinson was in its employ at the time

it is claimed he was. It is not denied that he was at the work at which he claims to have been; that he was put there by the superintendent of the company, or by some other person having the right to assign him to that duty; and it is not denied that the bridge fell at the time it is claimed it did; nor is it denied that Mr. Rollinson was injured. The company does claim, however, that he was not injured so badly as he claims to have been, about the back and eyes; that they were not seriously injured, and that the injury to his back and skull, and every injury, except the hip, he has recovered from; and it denies that there was any liability on its part for this action.

It is claimed on its part that, at the time the bridge was built in 1873, it employed competent and skilful workmen to build the bridge, or men whom it believed to be so—had reason to believe so; that the bridge was built by a bridge builder having fourteen years' experience, a Mr. Boyd; that it was built of proper material; and it is claimed by the company that the testimony of Mr. Boyd goes to show that such a bridge should last from fifteen to eighteen years, and that the testimony of Mr. Boyd goes to show that it had been standing but eight years, from 1873 up to 1881, at the time that it fell; and that the testimony of the witnesses shows that such a bridge should have stood from fifteen to eighteen years, in the use to which it was put by this company; that the materials were of good quality, that the workmanship was all it should be, and that it was a safe bridge; and it is claimed on the part of the defendant company that, having put up such a bridge, it had a right to presume that it would stand for a reasonable time, or for such time as the men who built it had reason to believe, from the material used and the workmanship, it would stand.

In addition to this the defendant company claims that it is not liable for the accident or for damages caused by the accident, for the reason that for some time prior to the falling of the bridge it had its employees, different ones—having a carpenter and a blacksmith, the yard or pit boss—all employed around the works, some of them in the immediate neighborhood of the bridge; and that the instructions to these men were that they should exercise constant supervision over the bridge; that they should examine it at the proper time, and if any repairs were needed, to put just such repairs on the bridge as it did need; and it is claimed that the supervision over the bridge was

constant, and by men competent to discharge the duties assigned to them, and that they did discharge their duties; that the carpenter visited the bridge at proper times to see whether any repairs were needed, and that if they were it was repaired; and it is claimed that the blacksmith visited the bridge at proper times to tighten up the bolts or nuts, and that if he found any repairs in his line needed on the bridge, he made them at the proper time; and that it thus did everything that was necessary for it to do to insure the safety of its employees.

It was further claimed on the part of the defendant company, that it had no knowledge of any defect in the material or workmanship of the bridge; and it denies that it had any information or knowledge, as is claimed by the plaintiff to have been shown to have been given it by the testimony of Mr. Lynch.

It is claimed by the plaintiff, as you will remember, that Mr. Lynch notified the company of the fact that the bridge was defective in the timbers or supports; that they were somewhat decayed; but it is claimed on the part of the defendant company that the testimony of Mr. Hawthorne, the blacksmith, goes to show that he never went on the bridge with Mr. Lynch or anyone else, except his helper, whom he took along with him always when he went to repair the bridge; that he never went with Mr. Lynch, and that he never found any defect there that he could not or did not repair himself; and denied that he sent Mr. Lynch with any such word to Mr. Miles as Mr. Lynch claims he did.

It is claimed further on the part of the defendant company, that Mr. Miles testified that he never was notified by Mr. Lynch or anyone else that the timbers had become decayed or the bridge unsafe, and that if they were decayed to such an extent as to render them unsafe, they had no knowledge of that fact and therefore could not repair it, and that the company had taken all the steps necessary to keep it in proper condition, and that, having done so, it is not responsible for any accident, and not liable in this case for any damages suffered by Mr. Rollinson.

If it employed a man who had the skill and experience, or whom it believed to have had, and the bridge was constructed of proper material, if the defendant company had done all that could reasonably be expected of it in the original construction of the bridge, and if, after it was constructed, it had suitable persons to examine the bridge from time to time—persons who

were competent to discharge their duty, and who did go upon
the bridge and make the necessary examination of it, and put
such repairs on the bridge as they found it needed from time to
time; and if the company had no notice of any defect, in the
bridge, rottenness' of timber or other defect, so as to make it
necessary for the company to put upon it other repairs than
were done by its employees, then the accident would have been
purely an accident, and the defendants would not be responsible
for, and the plaintiff would not be entitled to recover, damages
in this action.

On the other hand, if the company did not have it examined
at proper times and by persons competent to discharge the duty,
but neglected it, and if it was notified that it was defective and
did not remedy it after knowledge, and the plaintiff was in-
jured by its neglect alone, then the plaintiff would have a right
—the defendants would be responsible for the accident, and [the
plaintiff would be entitled to recover in this action such dam-
ages as the jury may think under all the evidence in the case
he is entitled to recover.]

It will be for the jury to determine, first, whether the acci-
dent was caused by the negligence of the defendant company
by its neglect to properly keep the bridge in repair, have it ex-
amined at proper times and by competent persons, and keep it
in repair; and if it did so, it has done everything that could be
reasonably expected, and it would not be liable for the accident,
or for any damages caused by the accident. But if it had knowl-
edge of the defectiveness of any of the timbers, and failed to re-
pair it in time to avoid the accident, and the accident happened
through its neglect to do so, then it would be responsible for the
accident, and liable for damages in this action for the injuries
caused by the accident.

On the part of the plaintiff we have been requested to charge
the jury:" . . . 7. That the defendants cannot escape
liability in this case by showing that they intrusted the care and
repair of the bridge to persons inexperienced and incompetent
to discharge that duty, but must show that such parties were
fully qualified and fitted for such work."

That point is correct, and is affirmed as we have already in-
structed you. The men that were sent by the defendant com-
pany to make an examination of the bridge should have been
men who were competent to discharge such duty; and the de-

fendant company claims to have sent a carpenter and a black-smith, and that they were the only men in their employ or that they could employ that would have known what was necessary in the repair of the bridge, if they found anything needed. Third assignment of error.

The defendants asked the court to charge, *inter alia:* "That there is no evidence in the case proving knowledge of the defendants or any of them, of any defect or unsoundness in the bridge; that the only evidence proving such knowledge in their manager is that of David S. Lynch; that he is directly and fully contradicted by both James Hawthorne and Nathaniel Miles; that before the jury can find such information was given they must believe Lynch and disbelieve Hawthorne and Miles; and unless the giving of such information has been proved to the satisfaction of the jury, they must find for the defendants." Refused.   Sixth assignment of error.

The assignments of error also specified the portions of the charge in brackets and the admission in evidence of tables of expectancy of life, compiled for and used by the life insurance companies of which the witness is agent, namely, the Travelers' and Penn Mutual, as a basis of damages.

Verdict and judgment were for the plaintiff for $3,000.

*Boyle & Mestrezat,* for plaintiffs in error.—"While it is true that the juries are the judges of the credibility of witnesses, they have no unlicensed privilege to accept the uncorroborated assertion of one witness, and disregard, without reason, the opposing and concurring testimony of five equally credible witnesses, with equal opportunities of observation and knowledge. If they do this, however, it is within the power of the court trying the case, and of this court sitting in review, when a proper point raises the question of the sufficiency of the whole testimony, to pass upon that question also, and declare its convictions, notwithstanding the verdict."   Mead v. Conroe, 113 Pa. 220, 8 Atl. 374.

The court should not have affirmed plaintiff's seventh point. It required that to relieve the defendants from liability on the question of care of bridge they were bound to prove that the persons employed by them to keep it in repair "were fully qualified and fitted for such work."

Proof of actual competency is not necessary. If the defendants were guilty of no negligence in the selection of persons to look after the bridge, but employed those they believed to be competent, and gave them proper instructions, they discharged their whole duty, notwithstanding such persons were, in point of fact, incompetent. The presumption is that defendants used proper care and diligence in the selection of such persons; and the burden is on the plaintiff to overcome it by proof. Mansfield Coal & C. Co. v. McEnery, 91 Pa. 191, 36 Am. Rep. 662; Ardesco Oil Co. v. Gilson, 63 Pa. 146; Painter v. Pittsburgh, 46 Pa. 213; Keystone Bridge Co. v. Newberry, 96 Pa. 252; and National Tube Works v. Bedell, 96 Pa. 178.

The admission of tables of expectancy of life, not supported by authority and made by private insurance companies for use in their business, is error. Armsworth v. Southeastern R. Co. 11 Jur. 758.

The charge of the court, that "the plaintiff would be entitled to recover in this action such damages as the jury may think under all the evidence in the case he is entitled to recover," undoubtedly led to the unreasonable verdict which was rendered. The words were too general, and left the jury to make their verdict on their own notions of what the plaintiff was entitled to recover. This is error. Pennsylvania R. Co. v. Kelly, 31 Pa. 372; Pennsylvania R. Co. v. Ogier, 35 Pa. 60, 78 Am. Dec. 322; Pennsylvania R. Co. v. Books, 57 Pa. 339, 98 Am. Dec. 229; Philadelphia & R. R. Co. v. Adams, 89 Pa. 31, 33 Am. Rep. 721.

*Minor & Core* and *Nathl. Ewing,* for defendant in error.— The employer must furnish his servants with proper tools, machinery, etc., to operate with, and in good condition. If he does not, and the servant is injured by insufficiency in them, the employer is responsible. Baker v. Allegheny Valley R. Co. 95 Pa. 211, 40 Am. Rep. 634.

Where a railroad car is defective, and an injury results from such defect, the burden of disproving negligence is upon the carrier. Empire Transp. Co. v. Wamsutta Oil Ref. & Min. Co. 63 Pa. 14, 3 Am. Rep. 515; Leech v. The Miner, 1 Phila. 144.

A corporation which is bound in consideration of its franchise to keep a road or bridge in repair is liable for injury to a person for want of repair, whether the defect be patent or latent, un'ess

he is in default or the defect was from inevitable accident, tempest or lightning, or the wrongful act of a third person of which they had no notice or knowledge; and this although ordinary care was used in the erection or repair, and the work was done by competent workmen under contract. Pennsylvania & O. Canal Co. v. Graham, 63 Pa. 290, 3 Am. Rep. 549.

In estimating damages for injuries to the person, the jury may consider the pain suffered, bodily and mental, the exposure and loss of property they occasion, and loss of time. Pittsburg, A. & M. Pass. R. Co. v. Donahue, 70 Pa. 119.

In an action by a passenger for an injury by a collision, he may recover for a loss of anticipated profits in his business, occasioned by his disability to attend to it; but mere speculative damages are not to be considered. Pennsylvania R. Co. v. Dale, 76 Pa. 47.

The injuries being of a permanent character it was necessary for the jury to know how long this man would probably live, in order to be able to intelligently award him such damages as he was entitled to. The only evidence which could show this fact was the mortality tables.

"The reasons just stated," in treating of scientific works generally, "however, fail in their force when we approach books of exact science, in which conclusions, from certain and constant data, are reached by processes too intricate to be elucidated by a witness when on examination on a stand. The books containing such processes, if duly sworn to by the person by whom they are made, are the best evidence that can be produced in that particular line. When the authors of such books cannot be reached, the next best authentication of the books is to show that they have been accepted as authoritative by those dealing in business with the particular subject. Hence the Carlisle and Northampton Tables have been admitted by the courts as showing what is the probable duration of life under particular conditions. In order to verify the book it is proper to prove by a witness qualified to speak to the point, that it is in use in the particular line of business to which the book relates." Wharton, Ev. § 667.

Insurance tables have been long so used by the court of equity in England. Schell v. Plumb, 55 N. Y. 598; Mills v. Catlin, 22 Vt. 106; Sauter v. New York C. & H. R. R. Co. 66 N. Y. 50, 23 Am. Rep. 18; Baltimore & O. R. Co. v. State, 33 Md.

542; Williams's Case, 3 Bland, Ch. 221; Walters v. Chicago, R.
I. & P. R. Co. 41 Iowa, 71; David v. Southwestern R. Co. 41
Ga. 223; Rowley v. London & N. W. R. Co. L. R. 8 Exch. 226;
Ordway v. Haynes, 50 N. H. 159.

PER CURIAM:

This was mainly a question of fact for the jury. It would
have been manifest error to affirm the point covered by the sixth
specification of error, which declared that there was no evidence
proving knowledge of the defendants or of any of them of any
defect or unsoundness in the bridge.

The answer to the point covered by the third specification of
error might, standing by itself alone, be erroneous; but qualified
and explained as it was in the charge following the specific an-
swer, and being in view of the claim made by the defendants
below as to the men they had sent to examine the bridge, we do
not think it misled the jury.

The general charge is fair and correct.

Judgment affirmed.